**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
**MIGUEL FIGUEROA,**                                    :
                                                         :
                              **Plaintiff,**             :            **REPORT AND**
                                                         :            **RECOMMENDATION**
          **-against-**                                  :
                                                         :_____**04 Civ. 7805 (KMK)(LMS)**
**MICHAEL J. ASTRUE,**                                   :
**Commissioner of Social Security,**                     :
                                                         :
                              **Defendant.**             :
---------------------------------------------------------------X

**TO:   THE HONORABLE KENNETH M. KARAS, U.S.D.J.**

Miguel Figueroa brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"), finding that he was not entitled to disability insurance benefits or supplemental security income under the Social Security Act (the "Act").  Currently pending before the Court are the Commissioner's motion and Plaintiff's cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket #'s 15, 16, 18, 19).  Because I find that the Commissioner's decision regarding Plaintiff's claims employed the proper legal standards and is supported by substantial evidence, I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion should be granted, Plaintiff's cross-motion should be denied, and the case should be dismissed.

**I.   BACKGROUND**

              **A.   Procedural History**

On February 19, 2003, Plaintiff filed his applications for both disability insurance benefits and supplemental security income, claiming an inability to work since February 14,

2002.  Administrative Record ("AR") 58-60, 159-62.  His claimed disability included lumbar

disk herniation, radiculopathy, and nerve root lesions.  Id. 69.  Plaintiff's applications were

denied on April 16, 2003, id. 26-31, 163-67, and he thereafter requested a hearing by an

Administrative Law Judge ("ALJ").  Id. 33.  Following the January 14, 2004, hearing, the ALJ

issued a decision, on March 25, 2004, finding that Plaintiff was not disabled within the meaning

of the Act at any time from February 14, 2002, through the date of his decision, and denying

Plaintiff's claims.  Id. 14-24.  Plaintiff filed a request for review of the ALJ's decision with the

Appeals Council.  Id. 7-13.  On August 4, 2004, the Appeals Council denied Plaintiff's request

for review, rendering the ALJ's decision the final decision of the Commissioner.  Id. 4-6.

On October 1, 2004, Plaintiff commenced the instant action in this Court (Docket # 1),

alleging that the ALJ wrongly denied him disability benefits.  After filing an Answer (Docket #

6), the Commissioner filed a motion for judgment on the pleadings on the ground that the ALJ's

decision was supported by substantial evidence.  Docket #'s 15, 16, 18.  Plaintiff cross-moved for

judgment on the pleadings, arguing that the ALJ applied incorrect legal standards and that the

ALJ's decision was not supported by substantial evidence.  Docket # 19.

**B.    Medical Evidence**

On November 30, 1998, Plaintiff, who was employed as a maintenance worker, was

injured on the job while lifting a toilet bowl.  AR 138.  On December 29, 1998, Plaintiff was

examined by Dr. Gerald Gaughan, who reported that Plaintiff was complaining of pain in his

back, with intermittent radiating pain and numbness in his legs.  Id.  Plaintiff said that he

experienced moderate pain with bending and lifting and that standing was worse than sitting.  Id.

Plaintiff had been unable to work since December 1, 1998.  Id.   Plaintiff exhibited positive

straight leg raising bilaterally at 60 degrees with increased lumbar pain.  Id. 139.  His range of motion of the trunk was limited; his range of motion of his upper and lower extremities was within functional limits.  Id.  His upper extremity strength was 5/5, and his lower extremity strength was 4+/5.  Id.  Dr. Gaughan diagnosed Plaintiff with low back pain, and wanted to rule out lumbar disc displacement and lumbosacral radiculopathy.  Id.  He recommended an MRI of the lumbosacral spine to rule out lumbar disc displacement.  Id.  Dr. Gaughan opined that Plaintiff was totally disabled at that time.  Id.

An MRI of the lumbar spine taken on January 19, 1999, indicated a central disc herniation at L5-S1.  Id. 141.

Plaintiff returned to Dr. Gaughan on August 11, 1999, complaining of daily lower back pain radiating to both of his legs.  Id. 135.  Dr. Gaughan reported that Plaintiff continued to have a restricted range of motion of the lumbar spine, with marked pain and spasm in forward flexion and pain in extension.  Id.  Straight leg raising produced lower back pain at 35-40 degrees bilaterally.  Id.  Plaintiff had difficulty getting up from a chair after sitting for more than 5-10 minutes.  Id. 135-36.  His motor strength in his lower extremities was 5/5.  Id. 136.  Dr. Gaughan opined that Plaintiff was totally disabled from doing his job as a maintenance worker.  Id.  Dr. Gaughan diagnosed Plaintiff as having a herniated disc at L5-S1 "complicated by disc degeneration and compression of the thecal sac and post traumatic myofascial pain syndrome." Id.  He wanted to rule out traumatic lumbosacral radiculopathy.  Id.  Dr. Gaughan recommended further tests, vocational rehabilitation, physical therapy, and Motrin for pain relief.  Id. 136-37.  He noted problems with getting Plaintiff's insurance carrier to authorize EMG (electromyography) and NCV (nerve conduction velocity) studies and physical therapy.  Id. 135.

3

On September 8, 1999, Plaintiff was examined by a neurologist, Dr. Peter Kwan, who noted that Plaintiff was still complaining of lower back pain radiating down both of his legs. Id. 152. Upon examination, Plaintiff exhibited tenderness of the lumbar paraspinal muscle with moderate spasm and enhanced pain with extension, flexion, and lateral bendings bilaterally. Id. Straight leg raising was positive bilaterally at 45 degrees and enhanced with ankle flexions. Id. Dr. Kwan diagnosed Plaintiff with central lumbar disc herniation at L5-S1 and wanted to rule out traumatic lumbar radiculopathy. Id. He considered Plaintiff to be totally disabled at that time. Id.

Dr. Gaughan examined Plaintiff on September 15, 1999, reporting essentially the same findings and opinions as his previous examination in August. Id. 133-34. He once again cited the insurance carrier's refusal to approve EMG/NCV studies and physical therapy. Id. 133.

On November 24, 1999, Plaintiff returned to Dr. Kwan, who reported essentially the same findings and opinions as his previous examination in September. Id. 150-51. He still considered Plaintiff to be totally disabled and advised him to do home strengthening exercises. Id. 150.

On January 12, 2000, Dr. Kwan performed lumbar EMG/NCV tests on Plaintiff's lower extremities, the results of which were abnormal and indicated lumbar radiculopathy. Id. 131-32.

Plaintiff next saw Dr. Kwan on April 19, 2000, at which time Plaintiff continued to complain of lower back pain radiating down both legs as well as difficulty sleeping due to the pain. Id. 148. Plaintiff had not been getting physical therapy since the previous year, and Motrin had not been helpful. Id. Dr. Kwan's findings upon examination of Plaintiff were the same as the previous examination in November, 1999. Id. 148, 150. Dr. Kwan diagnosed Plaintiff with lumbar disc herniation at L5-S1 and lumbar radiculopathy bilaterally. Id. He told Plaintiff to

continue doing home strengthening exercises, and he prescribed Celebrex for pain relief.  Id.  Dr.

Kwan also recommended physical therapy if authorized by Plaintiff's insurance carrier.  Id.

      Subsequent examinations by Dr. Kwan occurred on June 28, 2000, August 9, 2000,

September 27, 2000, and November 22, 2000, with essentially the same findings and opinions.

Id. 144-47.  At some point during that period, Plaintiff received physical therapy.  See id. 144-45.

Also during that period, Plaintiff received treatment from Dr. Joshua Greenspan of Pain Clinics

of Greater New York.  Id. 153-56.

      At a visit to Dr. Greenspan on August 14, 2000, Plaintiff reported that his pain responded

well to Zanaflex, although it made him feel a little sleepy at night.  Id. 156.  Upon physical

examination, straight leg raising was positive at 30 degrees on the right side and 35 degrees on

the left side.  Id.  Plaintiff said he felt numbness and tingling upon crossing his legs as well as

upon straight leg raising.  Id.  Dr. Greenspan's plan was to continue the Zanaflex, but only at

night, and he recommended a lumbar epidural steroid injection.  Id.

      Plaintiff's next visit to Dr. Greenspan occurred on September 25, 2000, at which time he

reported no improvement in the level of pain he was experiencing.  Id. 153.  Plaintiff was not

taking any medications because he could not afford to, so Dr. Greenspan gave him two weeks'

worth of samples of Celebrex and Vioxx.  Id.  Plaintiff was awaiting approval for a lumbar

epidural steroid injection.  Id.  On October 23, 2000, Plaintiff saw Dr. Greenspan and reported

that his pain was still not under control with the Celebrex.  Id. 155.  Upon examination, Dr.

Greenspan noted positive straight leg raising at 35 degrees on the left side and 45-50 degrees on

the right side.  Id.  He found paraspinal muscle spasm and tenderness in the lumbar region.  Id.

Motor examination of the lower extremities was within normal limits.  Id.  Dr. Greenspan gave

Plaintiff trigger point injections to help relieve the spasm and gave Plaintiff additional samples of Celebrex.  Id.  On November 20, 2000, Dr. Greenspan saw Plaintiff, who reported that the trigger point injections from the prior visit were still giving him good pain relief.  Id.  Plaintiff also reported that he had been doing exercises which alleviated the pain.  Id.  Straight leg raising was negative on the left and positive on the right at 30 degrees.  Id.  Dr. Greenspan found that motor strength in the legs was reduced bilaterally but was still better than the prior visit.  Id.  Dr. Greenspan gave Plaintiff a prescription for Celebrex.  Id.

Plaintiff returned to Dr. Kwan on March 14, 2001, at which time he was doing home strengthening exercises and taking Advil and Celebrex for pain relief.  Id. 143.  Dr. Kwan reported essentially the same findings and opinions as his previous examinations of Plaintiff.[1] He still considered Plaintiff to be totally disabled and recommended that Plaintiff continue his home strengthening exercises and taking oral analgesics as needed.  Id.

Plaintiff next saw Dr. Kwan on July 17, 2002.  Id. 142.  The report notes that Plaintiff had returned to work in August, 2001, but that his symptoms had worsened, and Plaintiff stopped working on February 14, 2002.  Id.  Dr. Kwan noted that Plaintiff had stopped getting physical therapy in early 2001 since his insurance carrier would no longer cover it, but he recommended that Plaintiff resume getting physical therapy.  Id.  He also recommended follow-up orthopedic evaluations and pain management consultation.  Id.  Dr. Kwan reiterated that Plaintiff was totally disabled.  Id.

---

[1]Oddly, Dr. Kwan reported that Plaintiff last had physical therapy "twelve to sixteen months ago," id. 143, although, as noted above, his reports from September 27, 2000, and November 22, 2000, indicated that Plaintiff was receiving physical therapy at that time.  Id. 144-45.

On March 18, 2003, Dr. Antero Sarreal conducted a consultative orthopedic examination of Plaintiff.  Id. 119-21.  Dr. Sarreal noted that Plaintiff drove the 5-minute trip to the examination alone in his car without an assistive device.  Id. 119.  He said that Plaintiff could walk a limited distance of one block and had limitation in prolonged standing.  Id.  Dr. Sarreal reported that Plaintiff was taking Tylenol and Motrin for his condition.  Id.  He noted that Plaintiff was independent in dressing, undressing, and bathing and that Plaintiff performed household chores as much as possible, including cooking, shopping, and cleaning.  Id.  In addition, Plaintiff watched TV and visited and socialized with friends and family.  Id.

Upon physical examination, Dr. Sarreal found that without an assistive device, Plaintiff walked slowly, avoiding pressure on his back.  Id.  He noted that Plaintiff was able to squat at "one-third range with back pain" and that he had difficulty standing and walking on his heels and toes.  Id.  Plaintiff's upper extremities had full range of motion and normal muscle strength.  Id. 120.  Examination of the lumbar spine revealed moderate lumbar paravertebral muscle tenderness and spasm.  Id.  Supine straight leg raising was 50 degrees on the right and 60 degrees on the left, while sitting straight leg raising was negative bilaterally.  Id.  Plaintiff's hips had a full range of motion and 5/5 muscle strength.  Id.  The right thigh and leg was one-half inch larger than the left thigh and leg.  Id.  Both lower extremities had good control and coordination.  Id.  An x-ray of the lumbar spine was negative.  Id. 120, 122.  Dr. Sarreal diagnosed Plaintiff as having low back pain with radiculopathy of the right lower extremity with atrophy of the left thigh and left leg musculature.  Id. 120.

With respect to Plaintiff's functional capacity, Dr. Sarreal opined that Plaintiff had "moderate limitation in lifting and carrying heavy objects, pushing and pulling, prolonged

standing, and long distance ambulation.  There is no limitation in bilateral hand manipulation to include grasping, releasing, and fingering objects.  Bilateral hand grasp strength is 5/5."  Id. With respect to Plaintiff's back, Dr. Sarreal found that Plaintiff had "frequent limitation in crouching, squatting, bending, and climbing, occasional limitation in prolonged sitting, and minimal limitation in stooping and balancing."  Id.  He concluded that Plaintiff's prognosis was "[f]air with limitation."  Id.  Dr. Sarreal recommended that Plaintiff do trunk and extremity conditioning and strengthening exercises to prevent muscle atrophy and joint contracture deformity.  Id. 121.  He said that Plaintiff needed to take analgesics to relieve his pain.  Id.

Plaintiff returned to Dr. Kwan on January 7, 2004.  Id. 158.[2]  His findings and opinions were similar to those in the past, although he noted that Plaintiff was complaining of worsening lower back pain.  Id.  Dr. Kwan indicated that Plaintiff was seeing his chiropractor three times a week and recommended that Plaintiff continue that treatment as well as medical acupuncture.  Id.

Plaintiff's chiropractor, Dr. Richard Iglesias, filled out a report on January 7, 2004, in which he noted Plaintiff's diagnoses as "lumbosacral strain/sprain with lumbosacral radiculopathy."  Id. 123-30.  He noted that Plaintiff could sit up to 2 hours continuously and a total of 4 hours in an 8-hour workday; stand up to 30 minutes continuously and a total of 2 hours in an 8-hour workday; and walk up to 15-20 minutes continuously and a total of 2 hours in an 8-hour workday.  Id. 127.  Dr. Iglesias opined that during an entire 8-hour workday, Plaintiff could lift up to 5 pounds occasionally; carry up to 5 pounds occasionally; and could reach occasionally, but could not bend, squat, crawl, or climb at all.  Id.  He opined that Plaintiff could not use either

---

[2]The report states that Dr. Kwan last saw Plaintiff on "7/17/03," but this must be a typographical error, since the previous report in the record from Dr. Kwan is from an examination that took place on 7/17/02.  See id. 142.

of his hands for simple grasping, pushing and pulling of arm controls, or manipulation, nor could

he use either of his feet for repetitive movements as in pushing and pulling of leg controls.  Id.

128.  Dr. Iglesias' prognosis for Plaintiff was that he was "disabled from regular duties or work."

Id. 125.

Following the issuance of the ALJ's decision, Plaintiff submitted to the Appeals Council a

report from Dr. Richard Memoli concerning his examination of Plaintiff on March 2, 2004.  Id.

13.  Dr. Memoli's findings concerning Plaintiff's physical condition are similar to Dr. Kwan's

findings in his report from January 7, 2004.  Dr. Memoli opined that Plaintiff was totally disabled

from his "regular occupation and any occupation requiring bending, lifting, standing and walking

for prolonged periods of time as well as sitting."  Id.

### C.   **Other Evidence**

At the time of the hearing, Plaintiff was 35 years old and living in an apartment with his

12-year-old daughter.  Id. 174-75.  Plaintiff had a high school diploma and had earned about five

college credits.  Id. 191.  Plaintiff testified that his back hurt him constantly, with pain radiating

down his legs.  Id. 178.  He said that he could stand for 10 minutes at most, after which he

needed to either lie down or sit in a recliner.  Id. 187.  Plaintiff testified that he could walk two or

three blocks, but his back would get very stiff, he would feel shooting pain through his lower

extremities, and his lower legs would feel like they were going to buckle.  Id.  If he had to,

Plaintiff could carry about five pounds.  Id.  If he tried to lift more, his back would get stiff,

causing pain to his legs that would make his legs weak.  Id. 188.  Plaintiff testified that he would

lie down five to eight times a day for 30 to 45 minutes at a time.  Id.  He stated that he could sit

for up to 15 minutes but that there were some chairs in which he could not sit at all.  Id.  Plaintiff

testified that his back pain radiated throughout his entire back, up and down his spine.  Id.  He said that there are times when he feels numbness in his legs, and sometimes it lasts for almost a whole day.  Id. 188-89.  Plaintiff stated that he had difficulties with dressing and bathing, such as reaching, tying his sneakers, bending over to put on his pants/socks, and putting on his shirt.  Id. 200.  He testified that his daughter helps him put on his socks and sneakers.  Id.

Plaintiff testified that he never had surgery because he was scared, and there was no guarantee that it would help.  Id. 178.  Plaintiff was looking to get epidural injections, but the insurance company had yet to approve them.  Id. 179.

Plaintiff testified that he did not walk with a cane and that while one of his doctors tried to prescribe a back brace, the insurance company would not pay for it.  Id. 180-81.  He said that he could cook simple meals, could sometimes drive a car, and could do laundry if he had to, although his girlfriend did it for him.  Id. 181.  Plaintiff testified that he took his girlfriend and daughter with him to go grocery shopping and could carry a light grocery bag.  Id. 181-82.  He said that he could help his daughter with her homework.  Id. 183.

Plaintiff testified that during the day, he would watch the news or read the Daily News newspaper or Sports Illustrated magazine.  Id. 183.  He would also look at technical books about architecture or plumbing.  Id.  He would watch TV as well.  Id. 183-84.  Plaintiff testified that his girlfriend and his daughter washed the dishes but that he could wash them a little bit, although it was hard standing up.  Id. 184.  He could maybe handle washing a cup and a plate, so he got paper cups and plates.  Id.  Plaintiff testified that he did not participate in any social activities and that it was difficult for him to go out in the cold weather.  Id. 184-85.  He did not participate in any hobbies or clubs or go to church.  Id. 185-86.  Plaintiff testified that he did not take any

10

medications because it upset his stomach.  Id. 186.

Plaintiff stated that he had been receiving disability benefits and workers' compensation benefits, but he went back to work in August, 2001, because he loved working and wanted to save money for his daughter's college education.[3]  Id. 189.

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   Standard of Review

The scope of review in an appeal from a social security disability determination involves two levels of inquiry.  First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standard when determining that the plaintiff was not disabled.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the correct legal standard is grounds for reversal of the ruling.  Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984).  Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 106 (internal quotation marks and citations omitted).  When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides."  Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)).  "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).  If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not

---

[3]Plaintiff then stopped working on February 14, 2002.  Id. 142.

substitute [its own] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). Moreover, the ALJ "has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

### B.    Determining Disability

In the context of either disability benefits or SSI, the Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In evaluating a disability claim, regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial gainful activity." Id. at §§ 404.1520(a)(4)(i),(b); 416.920(a)(4)(i),(b). If the claimant is engaged in "substantial gainful activity," then the Commissioner will find that the claimant is not disabled. Id. Second, the Commissioner considers the medical severity of the claimant's impairments. Id. at §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The claimant's impairment will not be deemed severe "[i]f [he or she] do[es] not have any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities." Id. at §§ 404.1520(c), 416.920(c). Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, listed in

Appendix 1 to Part 404, Subpart P of the Social Security Regulations.  See id. at §§ 404.1520(a)(4)(iii),(d); 416.920(a)(4)(iii),(d).  If the claimant's impairments are not on the list, the Commissioner considers all the relevant medical and other evidence and decides the claimant's residual functional capacity.  See id. at §§ 404.1520(e), 416.920(e).  Then, the Commissioner proceeds to the fourth step to determine whether the claimant can do his or her past relevant work.  See id. at §§ 404.1520(a)(4)(iv),(e)-(f); 416.920(a)(4)(iv),(e)-(f).  Finally, if it is found that the claimant cannot do his or her past relevant work, the Commissioner will consider the claimant's residual functional capacity, age, education, and work experience to see if he or she can make an adjustment to other work.  See id. at §§ 404.1520(a)(4)(v),(g); 416.920(a)(4)(v),(g).

The claimant bears the burden of proof on the first four steps of this analysis.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps.  Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work.  DeChirico, 134 F.3d at 1180 (citation omitted).

## III.   DISCUSSION

In deciding Plaintiff's case, the ALJ correctly applied the five-step sequential analysis set forth in the regulations.  First, he found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset date of his disability, February 14, 2002.  AR 18.  Second, the ALJ determined that Plaintiff's impairments, consisting of "chronic low back pain with radiculopathy into the right lower extremity and with atrophy of the left thigh and leg" are

13

"severe impairments." Id.  Third, the ALJ considered whether Plaintiff's impairments met or

equaled the medical criteria of any of the impairments listed in Appendix 1 to Subpart P of Part

404 of the Social Security Regulations and found that they did not.  Id.

      Having found that Plaintiff's impairments did not meet or equal the medical criteria of

any of the listed impairments, the ALJ went on to determine Plaintiff's residual functional

capacity and concluded that Plaintiff had the residual functional capacity to "perform work at the

sedentary exertion level that requires no more than occasional postural maneuvers, such as

balancing, stooping, kneeling, crouching, and climbing ramps and stairs, that requires no

crawling and climbing ladders, ropes and scaffolds, and that requires no more than occasional

pushing and pulling with the lower extremities to include the operation of the [sic] pedals." Id.

20.

      At the fourth step in the analysis, the ALJ found that Plaintiff could not return to his past

relevant work as a maintenance worker, since it "requires medium exertion and is skilled," while

Plaintiff was "limited to a reduced range of sedentary work." Id. 21.  Consequently, the ALJ

proceeded to the final step in the sequential analysis.  At the fifth step, as noted by the ALJ, "the

burden of going forward with the evidence shifts to the Commissioner of Social Security to show

that other jobs exist in significant numbers within the national economy that the claimant can

perform, consistent with his medically determinable impairments, functional limitations, age,

education and work experience." Id.

      The ALJ received testimony from a vocational expert with regard to jobs that exist in the

regional or national economy for a person of Plaintiff's age, education, and work experience, and

with Plaintiff's residual functional capacity.  Id. 22.  The vocational expert identified three jobs

that an individual such as Plaintiff could perform:  order clerk, jewelry assembler, and surveillance system monitor.  Id.  Thus, the ALJ determined that Plaintiff was "able to perform a wide range of work activity at the sedentary exertional level."  Id.  Using Vocational Rule 201.28, Table No. 1, Appendix 2, Subpart P, Regulations No. 4 as a framework for decisionmaking, the ALJ concluded that Plaintiff was not disabled.  Id.  Consequently, he determined that Plaintiff was not entitled either to disability insurance benefits or to supplemental security income.  Id. 24.

The Commissioner contends that the ALJ's decision was supported by substantial evidence.  Plaintiff, in contrast, asserts four challenges to the Commissioner's decision:  1) the ALJ applied incorrect legal standards in analyzing the medical opinion evidence of record; 2) the ALJ's residual functional capacity determination was not supported by substantial evidence; 3) the ALJ did not properly assess Plaintiff's credibility; and 4) the Appeals Council failed to give appropriate consideration to the report of Dr. Memoli, which was submitted after the ALJ had rendered his decision.

A.      The Legal Standards Applied to the Medical Opinion Evidence of Record

Under the Social Security regulations, a treating physician's opinion regarding the nature and severity of the claimant's impairments will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2).  If the treating physician's opinion is not given controlling weight, then various factors are applied in determining what weight to give it:  (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment

relationship; (iii) the extent to which the medical source provides relevant evidence to support an

opinion; (iv) the extent to which the opinion is consistent with the record as a whole; (v) whether

the opinion is given by a specialist; and (vi) other factors which may be brought to the attention

of the ALJ.  Id. § 404.1527(d)(2)(i)-(ii), (d)(3)-(d)(6).  However, the ultimate determination of

whether a claimant meets the statutory definition of disability is reserved to the Commissioner.

20 C.F.R. § 404.1527(e)(1).  "That means that the Social Security Administration considers the

data that physicians provide but draws its own conclusions as to whether those data indicate

disability.  A treating physician's statement that the claimant is disabled cannot itself be

determinative."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

      Plaintiff contends that the ALJ improperly rejected the opinion of his treating neurologist,

Dr. Kwan.  In his decision, the ALJ explained that Dr. Kwan "consistently reported that the

claimant had palpation tenderness of the lumbar paraspinal muscles, with moderate spasm, with

enhanced pain with extension, flexion and lateral bending, evidence of muscle guarding with

flexion beyond 65 degrees, and positive straight leg raising at 45 degrees."  AR 19.  The ALJ

noted that "[a]s late as March, 2001, this physician was reporting similar findings, and indicating

that the claimant was totally disabled because of lumbar disc herniation, L5-S1[,] and lumbar

radiculopathy . . . However, the claimant was able to return to his past relevant work as a

maintenance worker, requiring medium exertion, in August, 2001, and he worked at the position

until February 14, 2002."  Id.  The ALJ stated that a letter from Dr. Kwan dated July 17, 2002,

"made similar findings as he had in the past," and the diagnosis "remained the same."  Id.  "These

findings were similar to the findings made by the doctor before the claimant returned to his past

relevant work at the medium exertional level."  Id.  Finally, the ALJ addressed the final report

from Dr. Kwan, dated January 7, 2004, stating that it "contain[ed] nothing new," and that the report noted that Plaintiff had not been seen by Dr. Kwan since July, 2003.  Id. 20.[4]  The ALJ stated that Dr. Kwan noted "that the claimant had the same objective findings upon physical examination that he had in July, 2003, and that he had the same diagnosis. . . . The doctor reported he considered the claimant to [sic] totally disabled, and advised him to continue his current treatment. . . . However, the doctor provides no specific objective abnormalities or functional limitations to explain why he feels the claimant is totally disabled.  In fact, it noted [sic] that the doctor expressed the same opinion based upon the same findings prior to the claimant's return to his medium work in August, 2001, as was discussed above in this decision."  Id.  Thus, the ALJ explained why he did not fully credit Dr. Kwan's medical opinion concerning the extent of Plaintiff's impairments.

Moreover, the ALJ explained how Dr. Kwan's opinion was inconsistent with other substantial evidence in the record, such as the findings and opinions of the consultative physician and Plaintiff's own statements regarding his functional abilities and his course of treatment.  The ALJ noted that at the time of the examination by the consultative physician in March, 2003, Plaintiff reported that he was independent in dressing, undressing, and bathing and did household chores as much as possible and that he watched television and visited and socialized with friends and family.  Id. 19.  The ALJ also cited to Plaintiff's activities of daily living questionnaire that he completed when he applied for benefits, in which Plaintiff reported that he was the primary caretaker for his minor daughter; that his hobbies included reading magazines and watching

---

[4]As explained in footnote 2, supra, this was most likely a typographical error, since Dr. Kwan's prior report was from July, 2002, not 2003.

television; that he continued to drive and could use public transportation; and that he did the shopping for the household.  Id. 21.  Likewise, at the hearing, Plaintiff testified that he was independent in his activities of daily living, took care of his 12-year-old daughter without help from the child's mother, did not use a cane or back brace, read magazines and technical manuals, watched television, and helped his daughter with her homework.  Id.

The ALJ noted the consultative physician's opinion that Plaintiff had "moderate limitation in lifting and carrying heavy objects, pushing and pulling, prolonged standing, and long distance ambulation . . . no limitation in bilateral hand manipulation to include grasping, releasing, and fingering objects, . . . frequent limitation in crouching, squatting, bending, and climbing, and occasional limitation in prolonged sitting, and minimal limitation in stooping and balancing."  Id. 20.  The ALJ remarked that Plaintiff did not use any potent pain analgesics, only Tylenol and Motrin, "despite his subjective allegations of disabling pain," and that although Plaintiff claimed to suffer dry mouth, nervousness, and stomachache at times from those medications, he never complained of such side effects to either treating or examining physicians.  Id.  Thus, as the ALJ explained, his residual functional capacity determination was based upon "the objective findings, which, according to the treating neurologist, were the same in August, 2001, when the claimant returned to medium work, as they were in January 2004, based upon the objective findings and the opinion of the consultative physician, and based upon the claimant's conservative course of treatment, and in affording the claimant's pain complaints some credibility."  Id.

Plaintiff additionally argues that the ALJ erred when he concluded that Dr. Kwan's opinion was not supported by any specific objective abnormalities but failed to recontact Dr. Kwan so that he could provide further information regarding such objective abnormalities.  "A

18

record that does not support a treating physician's opinion does not necessarily contain

deficiencies or gaps, however." Rebull v. Massanari, 240 F. Supp. 2d 265, 272 (S.D.N.Y. 2002).

Plaintiff nowhere alleges that any of Dr. Kwan's medical reports are missing from the record, or

that the administrative record is in any way incomplete. Thus, any inconsistencies in the

evidence are more properly viewed as credibility issues for the ALJ to resolve. See id. at 273

("According to the Second Circuit, '[g]enuine conflicts in the medical evidence are for the

Commissioner to resolve.' This aspect of the fact-finding function, a credibility determination, in

essence, would be rendered nugatory if, whenever a treating physician's stated opinion is found to

be unsupported by the record, the ALJ were required to summon that physician to conform his

opinion to the evidence.") (citations omitted).

   Plaintiff likewise contends that the ALJ erroneously disregarded the opinion of his

chiropractor, Dr. Richard Iglesias. While conceding that a chiropractor is not an "acceptable

medical source" as defined by the Social Security regulations, see 20 C.F.R. § 404.1513, Plaintiff

argues that in accordance with a recent Social Security Ruling, SSR 06-3p, 2006 WL 2329939

(S.S.A. Aug. 9, 2006), the ALJ should have applied the factors set forth in 20 C.F.R. §

404.1527(d), which are applied to the evaluation of medical opinions from "acceptable medical

sources," in his evaluation of Dr. Iglesias' opinion. As an initial matter, SSR 06-3p is

inapplicable to Plaintiff's case as it did not become effective until August 9, 2006, two years after

the ALJ's decision became final. See 2006 WL 2329939, at *7 ("This SSR is effective upon

publication in the Federal Register."); 71 Fed. Reg. 45,593 (Aug. 9, 2006). In any event, the ALJ

explicitly stated in his decision that he "did consider the report from the claimant's treating

chiropractor." AR 21. However, the ALJ noted not only that a chiropractor is not an acceptable

medical source, but that "the opinion of the chiropractor is contradicted by the opinion of the

consultative physician, who is an acceptable medical source . . ., by the claimant's conservative

course of treatment, by the objective medical findings of record, and by the claimant's wide range

of daily activities." Id. Thus, the ALJ decided to give only "minimal weight" to Dr. Iglesias'

opinion. Id.[5]

Lastly, Plaintiff claims that the ALJ erred in granting more weight to the opinion of

consultative physician, Dr. Sarreal, than to the opinions of Drs. Kwan and Iglesias.  However, the

ALJ provided ample reasons why he credited Dr. Sarreal's opinion over the opinions of Drs.

Kwan and Iglesias.  Even though Dr. Kwan was Plaintiff's treating physician, he only saw

Plaintiff twice (as opposed to Dr. Sarreal's single visit with Plaintiff) during the relevant period

of February 14, 2002, to March 25, 2004.  In any event, " 'the report of a consultative physician

can constitute substantial evidence.'  Indeed, '[u]nder 20 C.F.R. § 404.1527, not only may the

reports of consultative or non-examining physicians constitute substantial evidence of disability,

they may even override the opinions of treating physicians.' " Bossey v. Comm'r of Soc. Sec., No.

8:07-CV-116, 2009 WL 1293492, at *8 (N.D.N.Y. May 5, 2009) (citations omitted).

Consequently, this does not constitute error.

In sum, the ALJ applied the proper legal standards in evaluating the medical opinion

evidence of record.  Furthermore, based upon a review of the entire record, as summarized in

detail in Sections I.B. and I.C., supra, as well as in the ALJ's Decision, see AR 19-21, and as

_____

[5]Notably, SSR 06-3p states, "The evaluation of an opinion from a medical source who is
not an 'acceptable medical source' depends on the particular facts of each case.  Each case must
be adjudicated on its own merits based on a consideration of the probative value of the opinions
and a weighing of all of the evidence in that particular case."  2006 WL 2329939, at *5.

explained in Section III.B., <u>infra</u>, I conclude, and respectfully recommend that Your Honor

should conclude, that the ALJ's conclusion regarding Plaintiff's residual functional capacity is

supported by substantial evidence.

### B.   The Determination of Residual Functional Capacity

Plaintiff contends that the ALJ's conclusion regarding his residual functional capacity is

not supported by substantial evidence since the ALJ found that despite Plaintiff's limitation in his

ability to stoop/bend, he was nonetheless able to perform work at the sedentary level.  SSR 96-9p

states that an "ability to stoop occasionally, i.e., from very little up to one-third of the time, is

required in most unskilled sedentary occupations.  A *complete* inability to stoop would

significantly erode the unskilled sedentary occupational base and a finding that the individual is

disabled would usually apply, but restriction to occasional stooping should, by itself, only

minimally erode the unskilled occupational base of sedentary work.  Consultation with a

vocational resource may be particularly useful for cases where the individual is limited to less

than occasional stooping."  1996 WL 374185, at *8 (S.S.A. July 2, 1996) (emphasis in original).

Plaintiff relies on the opinion of Dr. Iglesias to support his argument that he could not bend, and

therefore could not stoop, at all.  However, as previously noted, the ALJ gave only minimal

weight to Dr. Iglesias' opinion and instead credited the opinion of Dr. Sarreal, who found that

Plaintiff had only a minimal limitation in stooping.  <u>See</u> AR 120.[6]  Furthermore, the ALJ took

---

[6]Plaintiff makes much of the fact that Dr. Sarreal found that he had "frequent limitation" in bending, which he argues conflicts with Dr. Sarreal's finding that Plaintiff had only "minimal limitation" in stooping.  <u>See</u> AR 120.  However, SSR 96-9p nowhere mentions bending among the various postural limitations discussed in the context of assessing a residual functional capacity for less than a full range of sedentary work, only stooping, and Plaintiff provides no support for his contention that bending and stooping are the same thing in that context.  Indeed, there would be no reason for Dr. Sarreal to assess Plaintiff's ability to bend and stoop separately

into account Plaintiff's postural limitation in determining what jobs he could perform given his residual functional capacity; he specifically asked the vocational expert to consider sedentary jobs that a person limited to occasional stooping could perform. Id. 191-92. Thus, the ALJ's conclusion that Plaintiff's postural limitation did not render him disabled is supported by substantial evidence.

## C.    The Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ erred by not properly considering his subjective complaints of pain and other symptoms. However, an ALJ's credibility findings are entitled to deference by a reviewing court. See Tejada, 167 F.3d at 775-76 (upholding ALJ's credibility determination, citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985), in which the district court noted "that after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, the ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment."); see also Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant. If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.") (internal quotation marks and citation omitted). In rendering his decision in this case, the ALJ carefully considered all of Plaintiff's subjective complaints concerning his physical limitations, giving detailed reasons why he believed they

---

if they were the same thing. In any event, SSR 96-9p states that only a "*complete* inability to stoop" would usually lead to a finding that an individual is disabled, and Dr. Sarreal found that Plaintiff had only "minimal limitation" in stooping and "frequent limitation" in bending.

were not entitled to great weight, and such findings are supported by substantial evidence in the record.  See AR 18-22 (including citations to record evidence).  Consequently, there is no basis to disturb these findings.

**D.  Dr. Memoli's Report**

Plaintiff claims that the Appeals Council erred in not considering Dr. Memoli's report, which was included in Plaintiff's May 8, 2004, submission to the Appeals Council, see AR 7-13, and which he claims would have changed the ALJ's decision.  The Social Security regulations state that the Appeals Council shall consider new and material evidence relating to the period on or before the date of the ALJ's decision and will "review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970.  "Because the regulations require the Appeals Council to review the new evidence, this new evidence must be treated as part of the administrative record."  Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).  "When the Appeals Council denies review after considering new evidence, [the court] simply review[s] the entire administrative record, which includes the new evidence, and determine[s], as in every case, whether there is substantial evidence to support the decision of the [Commissioner]."  Id. at 46.

Plaintiff made no reference to Dr. Memoli's report in his May 8, 2004, letter to the Appeals Council, nor did the Appeals Council mention that it considered Dr. Memoli's report in its decision.  See AR 4-6.  Nonetheless, the report is a part of the administrative record available for the Court's review in evaluating Plaintiff's contention that the report would have changed the ALJ's decision.  Dr. Memoli's medical findings, based on an examination conducted on March 2, 2004, were similar to those in Dr. Kwan's report from January 7, 2004, which had been taken into

23

account by the ALJ, as well as by the Appeals Council.  Id. 4 (Appeals Council noted that Dr. Kwan's report "duplicates information already of record in your case . . . and, therefore, provides no basis for changing the Administrative Law Judge's decision."); see id. 11, 13, 158.  Dr. Memoli opined that Plaintiff was "totally disabled for [his] regular occupation and any occupation requiring bending, lifting, standing and walking for prolonged periods of time as well as sitting." Id. 13.  However, the ALJ likewise concluded that Plaintiff was unable to return to his former job as a maintenance worker, and the ALJ's conclusion regarding Plaintiff's residual functional capacity was not inconsistent with Dr. Memoli's opinion.  Id. 20-21.[7]  Therefore, the Appeals Council did not err in declining to review the ALJ's decision based on this evidence, nor does this evidence alter the Court's conclusion that the ALJ's decision is supported by substantial evidence.

## **CONCLUSION**

For the aforementioned reasons I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion for judgment on the pleadings (Docket # 15), should be granted, Plaintiff's cross-motion for judgment on the pleadings (Docket # 19), should be denied, and the case should be dismissed.

## **NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties

---

[7]The Court finds that Dr. Memoli's report is ambiguous, at best, concerning Plaintiff's limitation in sitting.  However, given that his opinion is based on medical findings similar to Dr. Kwan's and that Dr. Kwan opined that Plaintiff was totally disabled – an opinion which was rejected by the ALJ for reasons set forth in his decision – Dr. Memoli's report is not new evidence that undermines the ALJ's decision.  Moreover, in arriving at his decision concerning Plaintiff's residual functional capacity, the ALJ took into account Dr. Sarreal's finding that Plaintiff had occasional limitation in prolonged sitting.  See id. 20.

shall have ten (10) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of thirteen (13) working days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Kenneth M. . Karas at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.

Dated: August __, 2009
White Plains, New York

Respectfully Submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Kenneth M. Karas, U.S.D.J.

Counsel of Record for Plaintiff and the Commissioner of Social Security